Mr. Braverman. Good morning. May it please the Court. I am Sam Braverman. I represent the appellant, Nicholas Washington, who is the defendant in a criminal trial below before Justice Italiano. Principally, without abandoning any of the major arguments that I've put into my papers, I'd like to focus on two in particular issues here today in my eight minutes. Obviously to pivot to anything the Court would like to discuss. Fundamentally, there are issues that we think that affect all the counts of conviction. Those are the arguments that we raised that are the Fifth Amendment violation we said about a common made-by-law-enforcement witness about my client's right to remain silent, the Sixth Amendment right of confrontation about witnesses who are allowed to testify, about scientific tests that they themselves did not conduct, and then questions as it relates to the jury instructions. The second issue relates specifically to the 924 counts. There are three issues there that we think are important, the first being the issue as it relates to the jury instructions of the 924C and 924J, which we think diluted the standard of mens rea there and confused the jury. Secondarily, the double jeopardy argument that we raised that Barrett v. United States we think has addressed and has raised an issue here, Barrett affirming this Court on a particular issue. And third, what we think is an important issue, particularly in light of the Court thinks there are other issues important, is the sentencing facts as found and stated by the judge at sentencing on the discretionary life sentences that the judge issued on the 924J counts, which we think were insufficient based on the record. So turning to the first one, with respect to the underlying convictions, there are a couple of issues that we think are raised that really call for a reversal by this Court. The first one is that fundamental rights of the defendant, as encompassed by the Bill of Rights, things such as the right to remain silent. An individual obviously has a right to remain silent. That is a sacrosanct right from the Fifth Amendment. Yet testimony was allowed over objection at the trial court where a law enforcement witness was allowed to testify that he went to the defendant when the defendant was incarcerated at a Fort Dix penitentiary. The defendant was not in the yard or something else. He was brought to a room where the law enforcement officers met with him. And the law enforcement officers said, we'd like to talk to you about this case. Well, it's not just we'd like to talk to you. They began by saying that he's not required to talk to them, right? Absolutely. They advised him. Let's assume for a moment that that is tantamount to saying you have a right to remain silent. The defendant said, I don't want to answer questions. So if it ended there, that necessarily wouldn't be a violation of the law. Why, then, would an officer be allowed to testify at a trial as to any part of that event? If I exercise a right, if any one of us exercise a constitutional right, that should never be in any way allowed to be used against us because we have that right to remain silent, even if he just said nothing, even if he didn't say a word, but he actually said, I don't want to answer questions. The question is not what he said. The question is whether he was in, it was a custodial interrogation, right? Well, it's in part, it's a custodial, question of that, Your Honor, is if it's custodial and he is brought to this area, it's not that, I said, he's not just in the yard. Courts have had being in jail as itself. Like, yeah, so he's in jail, right? So he's in custody on a charge, but he's not in custody for an interrogation. They did not bring him. At the outset that you don't have to talk to us, and then I take it that the thing that the discussion lasted 10 minutes and it ended when he said he wanted to think more about something. Right. I mean, why would somebody think that they were required to stay there and answer questions? Why would a person, why would a witness be allowed to testify even to those facts? Let's assume, as the court states, absolutely he's not in custody. Let's assume that for the moment. Why would a witness? Even if it was not a custodial interrogation, it still should be inadmissible? It still should be inadmissible, because if the fundamental thing that the defendant did there was to not speak, to enforce his right to remain silent, why should that ever be allowed to be commented on? I don't think I would say that the case law says, the Constitution says, it's just a permitted right to remain silent and should never be allowed to testify. If somebody were to walk up to somebody and say, I advise you of such a right, and then the defendant chose to exercise their right, and then somebody says, well, I tell you, let's talk about why he remained silent. All right. Let me ask you just you, I think you just said this was objected to testimony. This is, this was objected to at trial? I believe it was, Your Honor. You believe it was? Or do we, I, I think the government argues that this is a plain error review on this issue. I, I, I believe that, I believe that the argument was that he was, it was custodial. But the testimony at trial itself. Yeah. That, when it came up there, was not objected to at the time. So either we're on plain error or we're on abusive discretion, because it's. Let's quote, yes, Your Honor. And let's say, let's say plain error. So given this conversation, in the context of the whole trial, when we review evidentiary questions, I mean, you can argue to me that this is different because it impacts a, a Fifth Amendment privilege, but how did this affect the outcome of the trial? How did this prejudice your client? Well, Judge, I would say there are two ways it affected the client. The first one is, I would say that there's always a prejudice to a defendant when a, when a government violates a constitutional right. I would say that that's, it itself is a per se prejudice. And it is a substantial right. If it's in the Bill of Rights, I think we could fairly call it a substantial right. I would say that that, if you then take that in paramateria with the other rights that we think were violated, for example, the right of confrontation of the Sixth Amendment. Well, but we're taking this error. You haven't argued, I don't think, one of these confluence of errors theories, right? Well, I, I. As to this specific error. As to this specific error. The client's un-Mirandized statement that's admitted at trial in violation of your client's Fifth Amendment privilege. What's the, what was the harm based, because that conversation is fairly innocuous. You say it introduces consciousness of guilt and something about his relationship with his mother, right? But what's the harm to your client? What's the prejudice from the, if that, what's the effect of that statement on the  Judge, I'd like to tell you that it was the turning point in the trial. I can't argue it's the turning point in the trial. I can't tell the Court that it is, without a doubt, the sine qua non of a reversal. It just isn't that much. If we remove it, do we think it has, that has any effect on the, on the outcome? I think if we remove it, as we continue to, let's assume that this Court were to, to continue to try and clear errors as I point them out, and the Court agreed with me and said, okay, let's remove that testimony. And then we get to the Sixth Amendment claim that I make as well. And then we get to the jury instruction claims that I make. So this is a confluence of errors argument. I, I think individually they stand, but more importantly, they come together as a confluence of errors. That's a fair point. Okay. There is a set, there is a line of cases about that sort of approach, right? I understand that, Your Honor, and that's fair. And obviously, I'm bound by the precedent of that. But let me ask, well, but also, I'm just sort of pointing out that I don't think you raised that as a theory. I did not raise that as a theory in the first place. So let me ask about you. In your introduction, you, you mentioned a couple of the arguments that you raised in your supplemental letter brief. Yes. Why should we consider other than, that was requested to talk about the, the gun cases, right, the Zyrka cases, the line of cases. So why should we accept new arguments in the supplemental brief that weren't raised in your primary brief? Why are those not forfeit? I would say, Your Honor, first and foremost, I would say that the letter from this Court did not say it was limited only to that. And I. But we don't say in a reply brief, you're, you know, we don't, but the rule is, whatever's not raised in your primary brief is generally forfeit on appeal, right? Understood. Understood. Is there some reason those two only came up? I'm not worried about the Zyrka stuff, because that's what the purpose was. Right. Is there a reason that those two came up, those additional two arguments, the jury instruction argument and the other, only later? And is there, are those something we should consider for some special reason? I do think that they should, I do think that the Court should consider them, because I think they are plain on the record. I think, even though they were not briefed in the first round of briefing, I do think that they are still plain on the record. And I do think that they go to the fundamental question of those two 924J counts. So it would be manifest injustice if we failed to consider them? Is that the argument? I would suggest to the Court that that is a fair point. But you didn't argue that either. I didn't argue that, Judge, in the first round of briefing. That is correct. No, but you didn't argue in your supplemental brief, please consider these additional arguments, because failure to do so would be manifest injustice or otherwise. I included them in my brief, and I ask the Court to consider them.  Can I ask you, so you mentioned the Confrontation Clause questions. Yes, sir. So I get the idea that the analyst who testified did not do the underlying analysis. But the testimony that came in was that the victim's jacket had DNA associated with the victim and somebody who was unidentified. And that they did a tape lift from the Yankees hat. Yes, sir. And there was DNA from an unidentified male, and it was not a woman, right? Yes, sir. So did that testimony hurt your client? Isn't that actually helpful to your client, to say that it's not the person that he would have sent to do the killing? And otherwise, they couldn't identify, or they didn't identify the person. So how was there any prejudice at all either? Well, I would say, Your Honor, that Smith v. Arizona, which was decided after our case went into briefing, Smith was a 9-0 decision which said that even circumstances where the new expert testifies as to the conclusions that are drawn from the raw data, that it still requires the underlying tester to show why that data, how that data was accumulated. No, I get it. So I get the idea that it is a violation of the Confrontation Clause. But we still say that there has to be prejudice, right? I think this is also a plain error question, right? Right. Correct. It has to affect the outcome. So I'm just asking, like, that testimony is not actually incriminating. If anything, it's helpful to Washington that the DNA did not belong to a low man, right? So why is it harmful to his case that that testimony came in? I think it's harmful in two ways, Your Honor. One is that, with respect to the testimony, I — one could never know what it could have been done had it been done, or at least a — let's assume I cross-examined the actual tester, and then I can confront that actual tester with data that says the actual tester's test was itself insufficient, and therefore, maybe the hair would have come out more definitive as one way or the other. I don't know what it would have done. Well, I — but we're not imagining what hypothetically could have happened if somebody else testified. The question is, if it was erroneous to allow the testimony, you have to show that it harmed your client for — right? Yes. Okay. So why is it harmful to say there was DNA from the victim and somebody we haven't identified? One of the things that — I guess this goes back to Judge Merrin's question earlier. The government says in the beginning of their briefing that the most important witness they have is Morris, and Morris is the co-conspirator who tells everything about my client. And that Morris is corroborated objectively by other events, one of which is Roberson, which is the confrontation clause question that I raised as well in our brief — in our original brief. The — the concept that all these other various different facts that the government introduces, for example, the DNA, even if the DNA doesn't come directly to my client, it's all for as evidence to corroborate the testimony that these events happened. So, for example, if a jacket comes in and there's some testimony that identifies it as — it's putative owner or the DNA that connects it to the scene, each of those things is individually offered up by the government to support their ultimate claim that their co-operator is the turning point of the case. Because that jacket, as the Court says, does not say, it doesn't have my client's DNA on it to do it. So you're saying that your client's defense was that no killing ever occurred, and the fact that they took for granted that there was somebody who died?  So what's the — so I guess I don't understand your point about how it is prejudicial to your client's defense. Again, Your Honor, as I conceded to Judge Marion earlier, it's a collection of problems. It's a collection of problems. No, I understand. But if anything, actually, that's helpful to your clients. That individual — I don't even see how it could add to something else than accumulate prejudice. It doesn't even have a tiny bit of prejudice, right? Well, I mean, if the Court were to say here today in a decision that that error, because it helped my client, is therefore not an error, I think that, of course, creates a precedent that nobody would want to endorse. We don't want to — It could be an error, but it might not be plain error because one element of that is prejudice, right? But confrontation clauses are so fundamental. Confrontation — I mean, we routinely review things for plain error and for harmless error, and, you know, we always acknowledge, well, that is an error, but it's only reversible if there's prejudice. Like, it's not a new idea. It's not a new idea. I understand that, Your Honor. It's not a new idea. The Roberson issue — to just segue to something else. I see that my time has expired. If I could just address this one last issue. Okay. The Roberson issue, which is a Brady-Giglio question, which is that the evidence was there were some evidence that was directly in the government's possession prior to the conclusion of the trial and some evidence that came in at the day of the verdict, neither of which were disclosed to the defendant for approximately two months after the  That is, again, a Fifth or Sixth Amendment's confrontation due process, a right of confrontation where the government has information that could be used to impeach their main witness, as the government says in the brief. One of the great values of Roberson is that he corroborated Morrison, their primary witness, and that witness, Roberson, had information that was either materially false at trial or inconsistent with his trial testimony, and the government had it. Separate apart from the — There to be a Brady violation that, you know, requires the trial, that needs to be material evidence that's withheld. And that, again, turns to prejudice. So what's the prejudice? Well, the prejudice in that one — His credibility was already challenged, that he was a criminal and a drug dealer and had violated parole, right? Right. So what did the other charges that you learned about, what would that have added to the trial? Well, what it would have added, Judge, two things. One is that he does not, in his original law enforcement interview, mention an assault that he testifies to at the trial. Two is that he denies that his situation is what it turns out to be, that he, in fact, has a cooperation agreement with the Queens County District Attorney's Office. And the government did not correct — certainly did not correct the former, where he admits in these proffer notes to other violent acts. If he's impeached in any way, that should not be a vaccination against impeachment on other material issues, either by omission of important testimony that's coming at trial or impeachment by additional violent acts that this Court would generally say that's good, fair cross-examination. The government then supports, Mr. Roberts, an investigation. You are allowed to impeach him on any grounds, if that is available. But, you know, when we're saying that you didn't have the evidence at the time, you didn't have the opportunity to do that, the question is, did that — could that have affected the outcome of the trial? And we've said a number of times that if it's cumulative of the impeachment evidence, it's not harmful. I think if it's 52 robberies and this is the 53rd, then there could be a culpable argument that it's cumulative. When it's a series of independent violent acts or omission of a violent act that is the specific point of testimony of a trial, I don't see how that could be cumulative, in a sense. And certainly, the government did not abandon their witness at their summations. They did not say, ignore Robertson because he's a relevant witness. They used Robertson to corroborate their other witness who testifies to some things that need corroboration. Otherwise, they are only in the words of that corroborating witness. Okay. Thank you very much.  Mr. Braverman, you've reserved time for rebuttal, so we'll hear from you again, but let's turn to the government. Mr. Tannen. May it please the Court, my name is Joshua Tannen. I'm an assistant United States attorney in the Eastern District of New York. I'd like to begin by addressing the three issues that the appellant raised here today, starting with the last one, which was the purported disclosure issue related to witness Frederick Roberson. The district court did not abuse its discretion in denying the appellant's motion for a new trial because the appellant fails to establish that there is a reasonable probability that the information that was disclosed after trial concerning Roberson would have changed the outcome of the trial. The key evidence in this case was a cooperating witness, Demetrius Morris' testimony, which lasted for three days and hundreds of pages of trial transcript, and recorded jail calls involving that witness, Morris, and the appellant. By contrast, Mr. Roberson's testimony lasted for just 20 pages of trial transcript, and served only to corroborate one small piece of Mr. Morris' story, the appellant's assault of Roberson for purportedly stealing drugs. In fact, contrary to counsel's representations a moment ago, the government did not even mention Mr. Roberson in its initial summation. He does get a mention briefly in the rebuttal summation, but not... That wouldn't have changed the outcome of the trial? Is that what you're saying? Yes, Your Honor. And in addition to that fact, as Your Honor alluded to earlier, the additional evidence would not have discredited him completely. There was significant, meaningful cross-examination of this witness based on his drug history, his criminal history, and indeed the very inconsistency between his testimony and prior statements to law enforcement that counsel raised a moment ago that during his interviews by law enforcement in 2007, he had not mentioned the assault that he testified to at the trial. So our position is that there was no reasonable probability that had this information been disclosed earlier, it would have... Would it have been a cooperation agreement with the Queens DA? Yes, Your Honor. So I think the position is the same with respect to that. That was not information that was in the government's possession prior to the conclusion of the trial. And, you know, I think would not have meaningfully altered the judgment of that witness's credibility here. Again, this was a witness who testified to significant drug history. It's information that was available to the government, right? So in my experience... Now, mind you, the New York State court online system is a mystery to me. But in Connecticut, when you have a federal case, you can look up the witnesses and the defendant and anybody else in the state system to see if they have pending charges. Isn't one of the questions here that he claimed the charges had already been dismissed, but they were in fact still pending? So, yes, Your Honor. So essentially, the witness testified that his non-parole related Queens charge was considered an ACD, which is, you know, essentially was going to be dismissed. But the information concerning the cooperation agreement and whatnot was not information that was... But in terms of generally his testimony being potentially perjurious, the cooperation agreement information could have flowed from the fact that he still had pending charges, right? If the federal government knew that he had pending charges in the state, maybe they would have made sure to inquire about the status. But what you're saying is the government did not know that he had said some false things on the stand. And my point is that it seems like these are things that the government, in preparing its witness in its case, not only could have, but probably should have known. The status of any pending state charges and why he was in custody, those kind of things. So the government did know that there were pending charges, Your Honor. And in fact, I think the witness testified to that effect. The question was, I think, more that he had pleaded guilty to those charges. So the difference is between it being ACD and subject to a guilty plea, right? Yes, Your Honor. I think that's correct. And there's... The other thing about his testimony is that he says he's being held on a probation violation, but there were these other charges. But the district court thinks that that's not inconsistent, because he seemed to have been released on recognizance of some of the charges. And so maybe he was held on the probation violation, right? Yes, Your Honor. I don't think anyone disputes that he was, in fact, being held in part based on a parole violation. I think that the issue was that he referred to an ACD for the separate... There were witness intimidation charges, the separate witness intimidation charges. I think the district court's point was that he may have genuinely understood that the agreement he had worked out with the Queens County District Attorney's Office was equivalent to... Was kind of an ACD, because he agreed to plead guilty, and so it means that he's not going to go to trial. Yes, Your Honor. It's not a technical use of the term ACD, but it means that there is a resolution pending. Yes, Your Honor. And on this point, I would, again, just... I'm happy to answer Your Honor's questions, but I would just, again, refer to the discrepancy in the significance of Mr. Roberson's testimony as compared to Mr. Morris's testimony. And in the question of the missing proper notes, did the court request and or did the government offer any explanation for why those were... How or why they were located after the close of evidence? I'm not aware of there having been a request, Your Honor. I'm familiar with the, you know, the correspondence that followed in which the government stated that it had, you know, subsequently located those notes and provided them to the defense. I think, you know, the significance of those notes is, as the district court found, not tremendous, in the sense that the defense counsel in the trial was, in fact, able to cross-examine this witness on discrepancies between his testimony and statements he made in proffer sessions in 2007... interviews in 2007. The only thing I think that was new from those other notes was his participation in a series of robberies that did not result in criminal convictions. And given the larger landscape here of who this witness was, what he actually testified to during the trial... The question is strong. I get it. But it is concerning, right, that this is a witness that the government put on, and somehow the notes emerge at this inopportune moment for the defense and fairly opportune moment for the government. It's concerning. I understand the prejudice point, but I guess I'll just say that... I'll note that that's concerning. Understood, Your Honor. Let's go to the Confrontation Clause question. So the analyst from the medical examiner's office does testify... I mean, you say in your brief that he testifies to the conclusions that the victim's jacket had DNA associated with the victim, as well as an unidentifiable individual, and that a tape lip from the Yankees had contained DNA from an unidentified male who was not Lowman, right? Yes, Your Honor. Okay, so those are propositions that come out of the report, right? Yes, Your Honor. And they're being offered for the truth of those propositions? Yes, Your Honor. Okay, so that's a Confrontation Clause violation, right? Well, so as Your Honor noted, our sort of primary position on this point is that these were not... This was not inculpatory evidence. Yeah, I get that argument. Yes. So you're saying even if there's a Confrontation Clause violation, there isn't harm to Washington. So why is the government introducing it at all? Your Honor, sometimes... I'm not certain of the answer to that question in this particular case. Sometimes the government introduces investigatory evidence of this nature because they anticipate that a jury will expect to hear things of that nature. Juries watch a lot of CSI Miami, so they think that there needs to be DNA evidence in the case. Is that the idea? That's correct, Your Honor. The evidence may... Lowman, didn't you talk to the people who tried this case? Your Honor, the assistants who tried this case are no longer with our office. I think certain elements... One can speculate as to reasons why they may have sought to introduce this evidence, including the one that I just mentioned. Ultimately, on the actual issue of the Confrontation Clause violation, I'm not sure we are necessarily prepared to concede that there would have been a violation here had that evidence been inculpatory. Although, you know, I understand that the... But you just agreed that the report concluded that about... These conclusions about the DNA testing and what the result of the DNA testing was, and that evidence was introduced by somebody who did not conduct the DNA testing. Your Honor, the witness... I get how it wouldn't be a violation of the Confrontation Clause if somebody were just testifying to the fact that you did DNA testing without suggesting that it was accurate or not accurate, just the fact that it happened. But that does not seem to be what the testimony is, right? The transcript says, well, what did you conclude? Meaning you, the whole examining office. And she says, well, we concluded that we couldn't... We didn't identify who the DNA belonged to. That seems to be introduced for truth. Yes, Your Honor. I don't think we dispute that. I would just say that the witness testified to having independently reviewed the processes and the data in the case. And so I think there's an available argument there that this was consistent with the Supreme Court's recent holding in Smith v. Arizona insofar as this witness was able to testify based on her personal experience. All right. I'm not sure about that. But you're saying because the evidence actually is helpful to him and actually there's no prejudice. Yes, Your Honor. Okay. On the Fifth Amendment question, right, about Camp 5, if you had never charged Camp 5 and you were doing a trial, could you have introduced evidence of that other shooting into the trial and all the other counts? When you say the other shooting, you mean the 2016? Count 5, yeah, the later one. I think it's 2016. Yeah. Your Honor, I suspect the answer is yes, that we could have. Why? As essentially my understanding of the way that the government would have proved the felon in possession charges that the defendant was located. No, I'm saying if there were not. So I'm evaluating his argument about whether the motion to sever should have been granted. So I'm imagining, like, let's say you never brought Camp 5. So there wasn't a felon in possession charge. You just have the RICO charges and the Druken Spirits charges and so on. How could you ever have introduced evidence of an unrelated shooting that happened after the RICO time and the Druken Spirits thing? I see, Your Honor. So I think in proving Count 6, the government would have needed to present evidence of the identification of the defendant and his interchange. So why is he even having that discussion with the officer, you mean? When he's first located and he presented a false identification, that would have gone to Count 6 and then the subsequent. Even if you had to explain that, you know, he was interviewed by an officer and then he lied to the officer, you wouldn't have to explain that he was interviewed by the officer after being arrested. That's correct. I think, Your Honor. Shooting, right? Yes, Your Honor. You're correct. You probably would not have introduced the evidence of the shooting. If there were no Count 5. If there were no Count 5. Why couldn't it have been 404? So, Your Honor, just to be clear on this, I think the government's position is that the 2016 shooting was not, had a different motive from the underlying 2005 and 2006 murders that were the basis for Counts 1 through 4.  The difference being what? I'm sorry, Your Honor, I didn't catch that. The difference being what? That the, essentially, the motive for the May 2016 shooting, which related to, although was not, well, which related to Count 5. The difference is the other shootings were part of the RICO enterprise and this was when he was on the run and it was unrelated to the RICO enterprise, right? So it wouldn't be evidence of the RICO charges. That's correct, Your Honor. Yes, Your Honor. Right. So it probably was not admissible, which means that he probably has a pretty strong argument that it should have been severed, right? Well, so, Your Honor, on the severance point, I think that the point there is that had the Count been in the case, that the government would have had to use overlapping proof to prove Count 5 and Count 6 and Counts 1 through 4. And that overlapping proof was the officer who first located him in the home in June 2016, then the officer who interviewed him where he acknowledged that he had been using a fake name shortly thereafter. And then for purposes of the felon in possession charge. The overlapping evidence, you wouldn't have had to introduce evidence of the actual shooting. But in any event, I guess you have this other argument that, well, he pleaded guilty to Count 5. And so that means he can't challenge it on appeal. That's correct, Your Honor. Unless it's a kind of jurisdictional objection. That's correct, Your Honor. And here, you know, he admitted to the elements of it. So it's hard to say that it's jurisdictional. That's correct, Your Honor. Okay, can I ask about the 924J question? Yes, Your Honor. So we've said that for 924C, the unit of prosecution is the drug trafficking charge, right? Yes, Your Honor. So even if you use a lot of different guns in the commission of a drug trafficking crime, you can't bring multiple 924C charges, right? Yes, Your Honor. So 924C just operates as a one-shot enhancement if you use any number of guns in the commission of a drug trafficking crime, right? That's my understanding, Your Honor. Okay. Well, so then if 924J is an especially serious use of a gun, why shouldn't it work the same way, that if you use a gun to cause a death, it's a one-shot enhancement and doesn't depend on the number of deaths that are caused? So, Your Honor, we would point to, there's a discussion in the brief about the Curtis case out of the Seventh Circuit, which determined that the unit of prosecution for purposes of 924J was the killing and not the underlying predicate based on the language of 924J, which essentially focuses on the causing of death through the use or possession of the firearm. Right. So 924J says a person who in the course of a violation of 924C causes the death of a person through the use of the firearm, you know, gets the extra penalty. But 924C says a person who during a relation to any crime of violence or drug trafficking crime uses or carries a firearm. So if you think causes the death makes that the unit of prosecution, you might think that 924C uses or carries a firearm is the unit of prosecution, but we know that it's not. So why should there be a different result between the two?  So I think the focus of the statute is different. The focus of 924J, as distinct from 924C, is the killing and not the use or carrying of a weapon in connection with a predicate. The Second Circuit, this was unfortunately not in our brief, but this court has in fact so held that the unit of prosecution ought to be the murder in a case called USB Jenkins from 2022 in a summary order. That's 2022 Westlaw 313-8879. And as the Curtis case held, and I think the Curtis case from the Seventh Circuit and the Jenkins case from the Second Circuit pointed to the absurdity of a different result, which would be that essentially a defendant would only be culpable for the first murder in connection with a... Right. It seems weird to say that Congress was indifferent to how many murders were caused, right? That's correct, Your Honor. But we have concluded that for purposes of 924C, that Congress wasn't indifferent to how many guns were used. So I think that's largely correct, Your Honor. I think that, but the statutes are different and they get at different harms. And I think the clear purpose of the language in 924J, as the Seventh Circuit held in Curtis and the Second Circuit held in Jenkins, is the murders. It's not the possession of the... It's not the underlying crime of violence or drug trafficking crime. So maybe it's just the nature of causing a death is something that is always culpable like in itself as an act, whereas the use of a firearm is something that makes the underlying crime more serious, something like that. That's the argument? Yes, Your Honor. I think that's a reasonable distinction. Okay. And with that, I think we would just, for the other arguments, rest on our briefs and ask this Court to affirm. Okay. Thank you very much, Mr. Tannen. We'll turn back to Mr. Braverman on rebuttal. Thank you, Your Honors. Very briefly, the three issues that were raised in colloquy with my colleague over here to my right. I don't think that an ACD really can be summarily or in any way equivalent to the deal that Mr. Weberson got. In an ACD, a judge would be required under criminal procedure law... That's true. It's not the technical thing, but the question is whether he committed perjury, right? And the district court thinks, well, he could have understood that he has a resolution that will lead to the... that will lead to... that will resolve the pending charges against him, and he might have been using the term ACD to refer to that. So I would think, Your Honor, that that couldn't happen, because under New York State law under an ACD, either criminal procedure law 17056 or 17555, the judge would have to tell an individual defendant, if you do this, your case will be dismissed. Whereas under the cooperation plea that would have taken place, where he pleaded guilty to felony charges, and part of his deal is they would be reduced to misdemeanor charges, the judge would have allocated him on that understanding. So he would have been under oath and had a judge explain to him exactly what the consequences of his plea were. So you're saying that he must have understood this technical distinction and was purposefully lying? Yes, sir. Why would he do that? Why would it matter whether he has a plea agreement or he has an ACD? At the time, the witness on the stand who puts his own interests above society may have felt it's easier just to give an answer like that and move on, particularly if it's not otherwise being confronted by those facts. And he couldn't have been confronted by them because the defense didn't have them. The defense didn't have the plea deal. What we do know also is that at the time of the trial, the law enforcement chief case officer who was at the table had conducted the proffer interview. And so, to which it's discussed also, that witness was sitting there at court and knew that there was other information because that witness, that agent, had himself heard the other information and it had never been disclosed. And under Federal Rule of Criminal Procedure 5F, now that would be attributable to the government. And 5F is not supposed to codify some new finding of law. It's to codify an existing understanding of law. As the Court said earlier, this is troubling. The witness at the trial, the chief case officer, knew there was another proffer and those notes had not been turned over. Now, I'm not saying that that person intended to obstruct justice. But the fact is, those notes were never turned over to the defense. And I think it's a little bit on, to say that there's no way it could have made a difference, a series of uncharged violent robberies. It's hard to say that a jury would say that that's irrelevant. The government didn't say it was irrelevant because the government raised it again in its rebuttal submission. The last one I wanted to address was in terms of the classic question the Court had for my adversary about the 924J. To the Court's point, an enhancement of a life without parole, an up to life without parole sentence on a 924J as an enhancement to be served consecutive to any other sentence is something that Congress can contemplate to say. That is to address that concern. Because 18 U.S.C. 1111, murder in the first degree, or the Vicar murders under 1959, is a way that Congress can say, we're not indifferent to the number of murders. You can prosecute all those number of murders in multiple different ways. But there's one enhancement for 924, for a violent crime used with a parole. I think everybody agrees that Congress could do one or the other. This is just a matter of statutory interpretation. So it's a question about whether that's what Congress did, right? And we do believe that Congress knows what they're doing. Congress thought that when it talks about getting an enhancement because during the commission of a crime, you used a firearm, that that is an enhancement that's really focused on the seriousness of the crime. But why wouldn't it be the case that if Congress writes a statute that has an enhanced penalty for causing the death of a person, it attaches to each death? Because Congress didn't write that. And best as I can say to the Court, Congress is presumed to know exactly what they're doing, whether or not there's some other evidence in the country. So a person who, in the course of a violation of 924c, causes the death of a person for the use of a firearm shall, if the killing is a murder, be punished by death or by imprisonment for any term of years or for life. Why doesn't that sentence straightforwardly say we want this enhanced punishment for every killing? For the very reason the Court said when you quoted from 924c as it relates to that charge, that the collection of those things is covered under one statute. And then there are facts to be found. So whether it's possessed, brandished, or used are other facts, and those have increasing penalties. And one of the other increasing penalties you could get is to cause the death of a person. Right. So then you're saying, well, if we know that 924c is only about the use of a firearm, as a characteristic of the offense, that when you get down to J, we should understand it the same way? Yes, sir. Okay. I understand that. Unless, of course, there's any further questions. Okay. Thank you very much, Mr. Braverman. The case is submitted.